ORIGINAL

## IN THE COURT OF COMMON PLEAS
### HAMILTON COUNTY, OHIO
### CIVIL DIVISION

| | | |
|---|---|---|
| **LAURA WEISBECKER**<br>50 Olympus Court<br>Hamilton, OH 45013 | : | Case No.    A 1 5 0 6 2 2 3 |
| | : | |
| | : | Judge: |
| | : | |
| **Plaintiffs,** | : | |
| | : | **COMPLAINT** |
| **v.** | : | **& JURY DEMAND** |
| | : | |
| **ABUBAKAR ATIQ DURRANI, M.D.**<br>PAKISTAN<br>(Serve via Hague Convention) | : | |
| | : | |
| And | : | |
| | : | **(ALL NEW DR. DURRANI** |
| **CENTER FOR ADVANCED SPINE**<br>**TECHNOLOGIES, INC.**<br>(Serve via Hague Convention) | : | **CASES SHALL GO TO**<br>**JUDGE RUEHLMAN PER**<br>**HIS ORDER)** |
| | : | |
| And | : | |
| | : | |
| **JOURNEY LITE OF CINCINNATI, LLC:**<br>10475 READING RD., SUITE 115<br>CINCINNATI, OH 45241 | : | |
| | : | |
| Serve: CT CORPORATION<br>1300 EAST 9TH STREET<br>CLEVELAND, OH 44114<br>(Serve via Certified Mail) | : | |
| | : **REGULAR MAIL WAIVER** | |
| **Defendants.** | : | |

Come now Plaintiffs, Laura Weisbecker, and file this Complaint and Jury

Demand, stating as follows:

1.    At all times relevant, Plaintiff was domiciled in the State of Ohio.

2.    At all times relevant, Defendant Dr. Abubakar Atiq Durrani ("Dr. Durrani") was

licensed to and did in fact practice medicine in the State of Ohio.

1



D112609828 INI

3.     At all times relevant, Center for Advanced Spine Technologies, Inc. ("CAST") was licensed to and did in fact perform medical services in the state of Ohio, and was and is a corporation authorized to transact business in the state of Ohio.

4.     At all times relevant, Journey Lite, LLC ("Journey Lite") was a limited liability company authorized to transact business and perform medical services in the state of Ohio.

5.     At all times relevant, Journey Lite held itself out to the public, and specifically to Plaintiffs, as a hospital providing competent and qualified medical nursing services, care, and treatment by and through its physicians, physicians in training, residents, nurses, agents, ostensible agents, servants and/or employees.

6.     The subject matter of the Complaint arises out of medical treatment by the Defendants in Hamilton County, Ohio. This Court is thus the proper venue to grant Plaintiffs the relief they seek.

7.     This case has been previously 41(A) voluntarily dismissed and now is being re-filed.

## FACTUAL ALLEGATIONS OF PLAINTIFF

8.     In June 2012, Ms. Weisbecker began experiencing lower back pain, numbness and tingling that stretched into her legs and feet following a motor vehicle accident.

9.     Sometime in 2012 following this accident, Ms. Weisbecker was referred to Dr. Durrani and CAST.

10.     Ms. Weisbecker had her first consultation with Dr. Durrani on December 27, 2012.

11.     During this consultation, Dr. Durrani immediately ordered surgery for the next day.

12.     It is believed that Dr. Durrani ordered the surgery for the next day because he knew that Ms. Weisbecker only had a few days left of health insurance coverage.

13.     On December 28, 2012, Dr. Durrani performed a laminectomy, foraminotomy and lumbar decompression procedure at L5-S1 on Plaintiff at Journey Lite of Cincinnati.

14.     Also during this surgery, Dr. Durrani used Baxano in a manner not approved for use by the FDA.

15.     Following the surgery, Plaintiff pain worsened and increased.

16.     An MRI from April 23, 2013 revealed "metallic artifacts," which by Dr. Pledger is believed to be metal shavings. This would be indicative of the use of Baxano.

17.     Plaintiff continued to treat with Dr. Durrani and CAST through July 2013.

18.     Upon information and belief, the surgeries performed by Dr. Durrani were medically unnecessary and/or improperly performed.

19.     As a direct and proximate result of Dr. Durrani's negligence and the Defendants Negligence Plaintiff has suffered harm

20.     Plaintiff did not become aware of Dr. Durrani's use of Infuse/BMP-2 or PureGen until she contacted her undersigned counsel.

## MORE SPECIFIC ALLEGATIONS BASED UPON DISCOVERY AND DEPOSITION TESTIMONY

21.     This information is to demonstrate the overall negligence and inappropriate actions of Dr. Durrani and the hospitals he worked with and/or for and/or in an individual capacity.

22.     Krissy Probst was Dr. Durrani's professional and personal assistant handling professional, academic, travel, surgery scheduling, his journals, his Boards, his credentialing, his personal affairs and his bills.

23.     Krissy Probst worked as Dr. Durrani's assistant for three years at Children's Hospital from 2006, 2007, and 2008.

24.     Krissy Probst reported Dr. Durrani to Sandy Singleton, the Business Director at Children's for his having an affair with Jamie Moor, his physician assistant.

25. Krissy Probst resigned in 2008 from Dr. Durrani and remained working for three other surgeons in the Orthopedic Department.

26.     Krissy Probst worked in the Orthopedic Department for eleven years from 2002-2013. She retired in May, 2013.

27.     Krissy Probst confirmed Dr. Durrani claims being a Prince, when he is not.

28.     According to Krissy Probst, Dr. Crawford, an icon in pediatric orthopedics treated Dr. Durrani "like a son."

29.     According to Krissy Probst, Dr. Crawford, Chief of Orthopedics at Children's unconditionally supported Dr. Durrani no matter the issues and problems Dr. Durrani faced.

30.     Dr. Durrani's patient care at Children's Hospital dropped off considerably after Jamie Moor became his physician assistant and they began their affair.

31.     Dr. Durrani was the only orthopedic spine surgeon at Children's who would perform a dangerous high volume of surgeries.

32.     At Children's, Dr. Durrani would begin a surgery, leave and have fellows and residents complete a surgery or do the full surgery while he was in his office with Jamie Moor, his physician assistant for four or five hours.

33.     Children's Board and administration knew about Dr. Durrani doing too many surgeries and not properly doing the surgeries. They did nothing.

34.     Dr. Durrani argued to Children's administration when they complained to him that he made them money so Children's tolerated him and allowed him to do what he wanted.

35.     Dr. Durrani, when told by Children's that Jamie Moor had to leave, told Children's that he would leave too.

36.     Dr. Agabagi would do one spine patient a day at Children's because it takes normally eight hours for a full fusion.

37.     Dr. Durrani would schedule two to three spine surgeries a day at Children's.

38.     Dr. Durrani would repeatedly have the Business Director, Sandy Singleton, or OR Director allow him to add surgeries claiming they were emergencies when they were not.

39.     Dr. Durrani would leave a spine surgery patient for four or five hours in the surgery suite under the care of fellows or residents, unsupervised and sit in his office and check on the surgery as he pleased.

40.     Dr. Peter Stern did not like Dr. Durrani while Dr. Durrani was at Children's because he knew all about his patient safety risk issues. Yet, Dr. Stern supported, aided and abetted Dr. Durrani's arrival at West Chester. It defies comprehension, but was for one of the world's oldest motives—greed of money.

41.     There is also a Dr. Peter Sturm, an orthopedic at Children's who also had no use for Dr. Durrani.

42.     Dr. Durrani chose his own codes for Children's billing which he manipulated with the full knowledge of Children's Board and management.

43.     Dr. Durrani was dating and living with Beth Garrett, a nursing school drop-out, with the full knowledge of his wife Shazia.

44.     Dr. Durrani was close with David Rattigan until David Rattigan pursued Jamie Moor and Dr. Durrani would not allow David Rattigan in the OR at Children's for a long time.

45.     Dr. Durrani, while claiming to have riches, does not. Dr. Durrani's wife's family paid for Dr. Durrani's education and it is her family with the significant wealth.

46.     Medtronics paid for Dr. Durrani's trips and paid him $10,000 fees for speaking or simply showing up at a spine conference.

47.     Krissy Probst's business director told her to save all Dr. Durrani related documents and information and she did.

48.     While doing research at Children's, Dr. Durrani would misstate facts regarding his research. Children's knew he did this.

49.     Dr. Durrani ended on such bad terms with Children's Hospital he was not allowed on the premises after his departure in December 2008, yet he performed a spine surgery there in February 2009.

50.     Eric J. Wall, MD was the Director of Surgical Services Division of Pediatric Orthopedic Surgery when Dr. Durrani left Children's.

51.     Sandy Singleton, MBA was the Senior Business Director of Surgical Services Division of Pediatric Orthopedic Surgery when Dr. Durrani left Children's.

52.     On information and belief, Dr. Durrani used his relationships with Children's officials to purge his Children's file of all patient safety and legal issues which had occurred as part of his departure "deal" which Defendants hide with privilege.

## DR. DURRANI COUNTS:

### COUNT I: NEGLIGENCE

53. Defendant Dr. Durrani owed his patient, Plaintiff, the duty to exercise the degree of skill, care, and diligence an ordinarily prudent health care provider would have exercised under like or similar circumstances.

54. Defendant Dr. Durrani breached his duty by failing to exercise the requisite degree of skill, care and diligence that an ordinarily prudent health care provider would have exercised under same or similar circumstances through, among other things, negligent diagnosis, medical mismanagement and mistreatment of Plaintiff, including but not limited to improper selection for surgery, improper performance of the surgeries, and improper follow-up care addressing a patient's concerns.

55. As a direct and proximate result of the aforementioned negligence and deviation from the standard of care on the part of the Defendant Dr. Durrani, Plaintiff sustained all damages requested in the prayer for relief.

### COUNT II: BATTERY

56. Dr. Durrani committed battery against Plaintiff by performing surgeries that were unnecessary, contraindicated for Plaintiff's medical condition, and for which he did not properly obtain informed consent, inter alia, by using Infuse/BMP-2, PureGen

and/or Baxano in ways and for surgeries not approved by the FDA and medical community, and by the failure to provide this information to Plaintiff.

57. Plaintiff would not have agreed to the surgeries if she knew the surgeries were unnecessary, not approved by the FDA, and not indicated.

58. As a direct and proximate result of the aforementioned battery by Dr. Durrani, Plaintiff sustained all damages requested in the prayer for relief.

## COUNT III: LACK OF INFORMED CONSENT

59. The informed consent forms from Dr. Durrani and CAST, which they required Plaintiff to sign, failed to fully cover all the information necessary and required for the procedures and surgical procedures performed by Dr. Durrani. Dr. Durrani and CAST each required an informed consent release.

60. In addition, no one verbally informed Plaintiff of the information and risks required for informed consent at the time of or before the Plaintiff's surgeries.

61. Dr. Durrani failed to inform Plaintiff of material risks and dangers inherent or potentially involved with her surgeries and procedures.

62. Plaintiff subsequently developed severe and grievous injuries as a direct and proximate result of lack of informed consent.

63. Had Plaintiff been appropriately informed of the need or lack of need for surgeries and other procedures and the risks of the procedures, Plaintiff would not have undergone the surgeries or procedures.

## COUNT IV: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

64. Dr. Durrani's conduct as described above was intentional and reckless.

65. It is outrageous and offends against the generally accepted standards of morality.

8

66. It was the proximate and actual cause of Plaintiff's psychological injuries, emotional injuries, mental anguish, suffering, and distress.

67. Plaintiff suffered severe distress and anguish so serious and of a nature that no reasonable man or woman would be expected to endure.

### COUNT V: FRAUD

68. Dr. Durrani made material, false representations to Plaintiff and her insurance company related to Plaintiff's treatment including: stating the surgeries were necessary, that Dr. Durrani "could fix" Plaintiff, that more conservative treatment was unnecessary and futile, that the surgery would be simple or was "no big deal", that Plaintiff would be walking normally within days after each surgery, that the procedures were medically necessary and accurately reported on the billing to the insurance company, that the surgeries were successful, and that Plaintiff was medically stable and ready to be discharged.

69. Dr. Durrani also concealed the potential use of Infuse/BMP-2 and/or Puregen in Plaintiff's surgeries when he had a duty to disclose to Plaintiff his planned use of the same.

70. These misrepresentations and/or concealments were material to Plaintiff because they directly induced the Plaintiff to undergo her surgeries.

71. Dr. Durrani knew or should have known such representations were false, and/or made the misrepresentations with utter disregard and recklessness as to their truth that knowledge of their falsity may be inferred.

72. Dr. Durrani made the misrepresentations before, during, and after the surgeries, with the intent of misleading Plaintiff and her insurance company into relying upon them.

9

Specifically, the misrepresentations were made to induce payment by the insurance company, without which Dr. Durrani would not have performed the surgery, and to induce Plaintiff to undergo the surgeries without regard to medical necessity and only for the purpose of receiving payment.

73. The misrepresentations and/or concealments were made during the Plaintiff's office visits at Dr. Durrani's CAST offices and/or at West Chester Hospital and/or at Journey Lite.

74. Plaintiff was justified in her reliance on the misrepresentations because a patient has a right to trust their doctor and that the facility is overseeing the doctor to ensure the patients of that doctor can trust the facility.

As a direct and proximate result of the aforementioned fraud, Plaintiff did undergo surgery, which was paid for in whole or in part by her insurance company, and suffered all damages requested in the prayer for relief.

## COUNT VI: SPOLIATION OF EVIDENCE

75. Dr. Durrani willfully altered, destroyed, delayed, hid, modified and/or spoiled ("spoiled") Plaintiff's records, billing records, emails, paperwork and related evidence.

76. Dr. Durrani spoiled evidence with knowledge that there was pending or probable litigation involving Plaintiff.

77. Dr. Durrani's conduct was designed to disrupt Plaintiff's potential and/or actual case, and did in fact and proximately cause disruption, damages and harm to Plaintiff.

## CAST COUNTS:

### COUNT I: VICARIOUS LIABILITY

78. At all times relevant, Defendant Dr. Durrani was an agent, and/or employee of CAST.

79. Dr. Durrani is in fact, the owner of CAST.

80. Defendant Dr. Durrani was performing within the scope of his employment with CAST during the care and treatment of Plaintiff.

81. Defendant CAST is responsible for harm caused by acts of its employees for conduct that was within the scope of employment under the theory of respondeat superior.

82. Defendant CAST is vicariously liable for the acts of Defendant Dr. Durrani alleged in this Complaint including all of the counts asserted against Dr. Durrani directly.

83. As a direct and proximate result of Defendant CAST's acts and omissions, Plaintiff sustained all damages requested in the prayer for relief.

### COUNT II: NEGLIGENT HIRING, RETENTION & SUPERVISION

84. CAST provided Dr. Durrani, inter alia, financial support, control, medical facilities, billing and insurance payment support, staff support, medicines, and tangible items for use on patients.

85. CAST and Dr. Durrani participated in experiments using Infuse/BMP-2 and/or Puregen bone graft on patients, including Plaintiff, without obtaining proper informed consent thereby causing harm to Plaintiff.

86. CAST breached its duty to Plaintiff, inter alia, by not supervising or controlling the actions of Dr. Durrani and the doctors, nurses, staff, and those with privileges, during the medical treatment of Plaintiff at CAST.

87. The Safe Medical Device Act required entities such as CAST to report serious

injuries, serious illnesses, and deaths related to failed medical devices to the FDA and the manufacturer; this was never done.

88. Such disregard for and violations of federal law represents strong evidence that CAST negligently hired, retained and supervised Dr. Durrani.

89. As a direct and proximate result of the acts and omissions herein described, including but not limited to failure to properly supervise medical treatment by Dr. Durrani, Plaintiff sustained all damages requested in the prayer for relief.

## COUNT III: FRAUD

90. CAST sent out billing to Plaintiff's insurance company after the surgeries at Journey Lite.

91. The exact dates these medical bills were sent out are reflected in those medical bills.

92. These bills constituted affirmative representations by CAST that the charges related to Plaintiff's surgeries were medically appropriate and properly documented.

93. The bills were sent with the knowledge of CAST that in fact Plaintiff's surgeries were not appropriately billed and documented and that the services rendered at Journey Lite associated with Dr. Durrani were not appropriate.

94. The bills sent by CAST to Plaintiff falsely represented that Plaintiff's surgeries were appropriately indicated, performed and medically necessary in contra-indication of the standard of care.

95. Plaintiff relied on the facility holding Dr. Durrani out as a surgeon and allowing him to perform surgeries at its health care facility as assurance the facility was overseeing Dr. Durrani, vouching for his surgical abilities, and further was appropriately billing Plaintiff for CAST's services in association with Dr. Durrani's surgery.

96. As a direct and proximate result of this reliance on the billing of CAST, Plaintiff incurred medical bills that she otherwise would not have incurred.

97. CAST also either concealed from Plaintiff that they knew about Dr. Durrani, including that Infuse/BMP-2 and/or Puregen would be used in Plaintiff's surgeries, or misrepresented to Plaintiff the nature of the surgeries, and the particular risks that were involved therein.

98. CAST's concealments and misrepresentations regarding Infuse/BMP-2 and/or Puregen and the nature and risks of Plaintiff's surgeries were material facts.

99. Because of its superior position and professional role as a medical service provider, CAST had a duty to disclose these material facts to Plaintiff and a duty to refrain from misrepresenting such material facts to Plaintiff.

100. CAST intentionally concealed and/or misrepresented said material facts with the intent to defraud Plaintiff in order to induce Plaintiff to undergo the surgeries, and thereby profited from the surgeries and procedures Dr. Durrani performed on Plaintiff at Journey Lite.

101. Plaintiff was unaware that BMP-2 and/or Puregen would be used in Plaintiff's surgeries and therefore, was unaware of the health risks of Infuse/BMP-2 and/or Puregen's use in Plaintiff's spine.

102. Had Plaintiff known before Plaintiff's surgeries that Infuse/BMP-2 and/or Puregen would be used in Plaintiff's spine and informed of the specific, harmful risks flowing therefrom, Plaintiff would not have undergone the surgery with Dr. Durrani at Journey Lite.

103.    Upon information and belief, Plaintiff believes the bills requested by Plaintiff will indicate that CAST falsely represented that Plaintiff's surgery was appropriately indicated, performed, and medically necessary in contra-indication of the standard of care.

104.    As a direct and proximate result of the fraud against plaintiff by CAST, Plaintiff sustained all damages requested in the prayer for relief.

## COUNT IV: OHIO CONSUMER SALES PROTECTION ACT

105.    Although the Ohio Consumer Sales Protection statutes O.R.C 1345.01 et seq. exempts physicians, a transaction between a hospital and a patient/consumer is not clearly exempted.

106.    CAST's services rendered to Plaintiff constitute a "consumer transaction" as defined in ORC Section 1345.01(A).

107.    CAST omitted suppressed and concealed from Plaintiff facts with the intent that Plaintiff rely on these omissions, suppressions and concealments as set forth herein.

108.    CAST's misrepresentations, and its omissions, suppressions and concealments of fact, as described above, constituted unfair, deceptive and unconscionable acts and practices in violation of O.R.C 1345.02 and 1345.03 and to Substantive Rules and case law.

109.    CAST was fully aware of its actions.

110.    CAST was fully aware that Plaintiff was induced by and relied upon CAST's representations at the time CAST was engaged by Plaintiff.

111.    Had Plaintiff been aware that CAST's representations as set forth above were untrue, Plaintiff would not have used the services of Defendants.

112. CAST, through its agency and employees knowingly committed the unfair, deceptive and/or unconscionable acts and practices described above.

113. CAST's actions were not the result of any bona fide errors.

114. As a result of CAST's unfair, deceptive and unconscionable acts and practices, Plaintiff has suffered and continues to suffer damages, which include, but are not limited to the following:

    a. Loss of money paid

    b. Severe aggravation and inconveniences

    c. Under O.R.C. 1345.01 Plaintiff is entitled to:

        i. An order requiring CAST restore to Plaintiff all money received from Plaintiff plus three times actual damages and/or actual/statutory damages for each violation;

        ii. All incidental and consequential damages incurred by Plaintiff;

        iii. All reasonable attorneys' fees, witness fees, court costs and other fees incurred;

        iv. Such other and further relief that this Court deems just and appropriate.

## COUNT V: SPOLIATION OF EVIDENCE

115. CAST, through its agents and employees, willfully altered, destroyed, delayed, hid, modified and/or spoiled ("spoiled") Plaintiff's records, billing records, emails, paperwork and related evidence.

116. CAST, through its agents and employees, spoiled evidence with knowledge that there was pending or probable litigation involving Plaintiff.

117.   CAST's conduct was designed to disrupt Plaintiff's potential and/or actual case, and did in fact and proximately cause disruption, damages and harm to Plaintiff.

## JOURNEY LITE COUNTS:

### COUNT I: NEGLIGENCE

118.   Journey Lite owed its patient, Plaintiff, through its agents and employees the duty to exercise the degree of skill, care, and diligence an ordinarily prudent health care provider would have exercised under like or similar circumstances.

119.   Journey Lite, acting through its agents and employees breached its duty by failing to exercise the requisite degree of skill, care and diligence that an ordinarily prudent health care provider would have exercised under same or similar circumstances through, among other things, negligent diagnosis, medical mismanagement and mistreatment of Plaintiff, including but not limited to improper selection for surgery, improper performance of the surgery, improper assistance during Plaintiff's surgery and improper follow up care addressing a patient's concerns.

120.   The agents and employees who deviated from the standard of care include nurses, physician assistants, residents and other hospital personnel who participated in Plaintiff's surgery.

121.   The management, employees, nurses, technicians, agents and all staff during the scope of their employment and/or agency of Journey Lite's knowledge and approval, either knew or should have known the surgery was not medically necessary based upon Dr. Durrani's known practices; the pre-op radiology; the pre-op evaluation and assessment; and the violation of their responsibility under the bylaws, rules, regulations and policies of Journey Lite.

122.   As a direct and proximate result of the aforementioned negligence and deviation

from the standard of care by the agents and employees of Journey Lite, Plaintiff

sustained all damages requested in the prayer for relief.

**COUNT II: NEGLIGENT CREDENTIALING, SUPERVISION, & RETENTION**

123.   As described in the Counts asserted directly against Dr. Durrani, the actions of Dr.

Durrani with respect to Plaintiff constitute medical negligence, lack of informed

consent, battery, and fraud.

124.   Journey Lite negligently credentialed, supervised, and retained Dr. Durrani as a

credentialed physician by:

   a.   Violating their bylaws and JCAHO rules by allowing Dr. Durrani to

   repeatedly violate the Journey Lite bylaws with it's full knowledge of the

   same;

   b.   Failing to adequately review, look into, and otherwise investigate Dr.

   Durrani's educational background, work history and peer reviews when he

   applied for and reapplied for privileges at Journey Lite;

   c.   Ignoring complaints about Dr. Durrani's treatment of patients

   reported to it by Journey Lite staff, doctors, Dr. Durrani's patients and by

   others;

   d.   Ignoring information they knew or should have known pertaining to

   Dr. Durrani's previous privileged time at other Cincinnati area hospitals,

   including Children's Hospital, Deaconess Hospital, University Hospital,

   Good Samaritan Hospital, West Chester Hospital/UC Health, and Christ

   Hospital.

125.   The Safe Medical Device Act required entities such as Journey Lite to report

serious injuries, serious illnesses, and deaths related to failed medical devices to the FDA and the manufacturer; this was never done.

126. As a direct and proximate result of the negligent credentialing, supervision, and retention of Dr. Durrani, Plaintiff sustained all damages requested in the prayer for relief.

## COUNT III: FRAUD

127. Ohio Administrative Code 3701-83-07(A)(5) states, "Each patient shall receive, if requested, a detailed explanation of facility charges including an itemized bill for services rendered.

128. The bills sent to Plaintiff, after multiple requests, were in violation Ohio Administrative Code 3701-83-07(A)(5).

129. Upon information and belief, Plaintiff believes that Dr. Durrani implanted BMP-2/or Puregen into Plaintiff.

130. Even after Plaintiff's Counsel and the Ohio Attorney General requested itemized billing, Journey Lite still did not provide an itemized breakdown of the charges; instead Journey Lite continued to provide "Account Ledgers," which contained barebones "Insurance Billing" and "Insurance Payments."

131. Due to Journey Lite's downright refusal to comply with Plaintiff's request for itemized billing, Plaintiff has been forced to file a class action suit against Journey Lite's for their egregious billing practices.

132. The bills sent by Journey Lite to Plaintiff falsely represented that Plaintiff's surgeries were appropriately indicated, performed, and medically necessary in contra-indication of the standard of care.

133.    Upon information and belief, Plaintiff believes the bills requested by Plaintiff will indicate that Journey Lite Hospital falsely represented that Plaintiff's surgery was appropriately indicated, performed, and medically necessary in contra-indication of the standard of care.

134.    The bills were sent to Plaintiff's insurance company with the knowledge of Journey Lite that in fact Plaintiff's surgeries were not appropriately billed and documented and that the services rendered at Journey Lite associated with Dr. Durrani were not appropriate.

135.    Plaintiffs relied on the facility holding Dr. Durrani out as a surgeon and allowing him to perform surgeries at its health care facility as assurance the facility was overseeing Dr. Durrani, vouching for his surgical abilities, and further was appropriately billing Plaintiffs for Journey Lite's services in association with Dr. Durrani's surgeries.

136.    As a direct and proximate result of this reliance on the billing of Journey Lite, Plaintiff incurred medical bills that she otherwise would not have incurred.

137.    Journey Lite also either concealed from Plaintiff that they knew about Dr. Durrani, including that Infuse/BMP-2 and/or Puregen would be used in Plaintiff's surgeries, or misrepresented to Plaintiff the nature of the surgeries and the particular risks that were involved therein.

138.    Journey Lite's concealments and misrepresentations regarding Infuse/BMP-2 and/or Puregen and the nature and risks of Plaintiff's surgeries were material facts.

139.    The use of BMP-2 increases a person's chance of cancer by 3.5%.

140.    Due to the unnecessary surgeries Dr. Durrani performed, Plaintiff has a 3.5%

increased chance of cancer because of the use of BMP-2.

141.  As a direct and proximate result of the use and implementation of Infuse/BMP-2 Plaintiff has incurred a 3.5% increase in the risk of Cancer. As a result Plaintiff has an increased fear of cancer.

142.  Because of its superior position and professional role as a medical service provider, Journey Lite had a duty to disclose these material facts to Plaintiffs and a duty to refrain from misrepresenting such material facts to Plaintiffs.

143.  Journey Lite intentionally concealed and/or misrepresented said material facts with the intent to defraud Plaintiff in order to induce Plaintiff to undergo the surgeries, and thereby profited from the surgeries and procedures Dr. Durrani performed on Plaintiff at Journey Lite.

144.  Plaintiff was unaware that Infuse/BMP-2 and/or Puregen would be used in Plaintiff's surgeries and therefore, was unaware of the health risks of Infuse/BMP-2 or Puregen's use in Plaintiff's spine.

145.  Had Plaintiff known before Plaintiff's surgery that Puregen would be used in Plaintiff's spine and informed of the specific, harmful risks flowing there from, Plaintiff would not have undergone the surgeries with Dr. Durrani at Journey Lite.

146.  Plaintiff is still awaiting itemized billing from Journey Lite Hospital reflecting the exact totals charged for the use of BMP-2 on Plaintiff.

147.  As a direct and proximate result of the fraud upon Plaintiffs by Journey Lite, Plaintiff sustained all damages requested in the prayer for relief.

148.  The bills were sent to Plaintiff's insurance company with the knowledge of Journey Lite that in fact Plaintiff's surgeries were not appropriately billed and

documented and that the services rendered at Journey Lite associated with Dr. Durrani were not appropriate.

149. The bills sent by Journey Lite to Plaintiff falsely represented that Plaintiff's surgeries were appropriately indicated, performed and medically necessary in contra-indication of the standard of care.

150. Plaintiff relied on the facility holding Dr. Durrani out as a surgeon and allowing him to perform surgeries at its health care facility as assurance the facility was overseeing Dr. Durrani, vouching for his surgical abilities, and further was appropriately billing Plaintiff for Journey Lite's services in association with Dr. Durrani's surgeries.

151. As a direct and proximate result of this reliance on the billing of Journey Lite, Plaintiff incurred medical bills that she otherwise would not have incurred.

152. Journey Lite also either concealed from Plaintiff that Infuse/BMP-2 or Puregen would be used in Plaintiff's surgeries, or misrepresented to Plaintiff the nature of the surgeries and the particular risks that were involved therein.

153. Journey Lite's concealments and misrepresentations regarding Infuse/BMP-2 or Puregen and the nature and risks of Plaintiff's surgeries were material facts.

154. Because of its superior position and professional role as a medical service provider, Journey Lite had a duty to disclose these material facts to Plaintiff and a duty to refrain from misrepresenting such material facts to Plaintiff.

155. Journey Lite intentionally concealed and/or misrepresented said material facts with the intent to defraud Plaintiff in order to induce Plaintiff to undergo the surgery, and

thereby profited from the surgery and procedure Dr. Durrani performed on Plaintiff at Journey Lite.

156.    Plaintiff was unaware that Infuse/BMP-2 or Puregen would be used in Plaintiff's surgery and therefore, was unaware of the health risks of Infuse/BMP-2 or Puregen's use in Plaintiff's spine.

157.    Had Plaintiff known before Plaintiff's surgery that Infuse/BMP-2 or Puregen would be used in Plaintiff's spine and informed of the specific, harmful risks flowing therefrom, Plaintiff would not have undergone the surgery with Dr. Durrani at Journey Lite.

158.    As a direct and proximate result of the fraud upon Plaintiff by Journey Lite, Plaintiff sustained all damages requested in the prayer for relief.

### COUNT IV: OHIO CONSUMER SALES PROTECTION ACT

159.    Although the Ohio Consumer Sales Protection statutes O.R.C 1345.01 et seq. exempts physicians, a transaction between a hospital and a patient/consumer is not clearly exempted.

160.    Journey Lite's services rendered to Plaintiff constitute a "consumer transaction" as defined in ORC Section 1345.01(A).

161.    Journey Lite omitted suppressed and concealed from Plaintiff facts with the intent that Plaintiff rely on these omissions, suppressions and concealments as set forth herein.

162.    Journey Lite's misrepresentations, and its omissions, suppressions and concealments of fact, as described above, constituted unfair, deceptive and unconscionable acts and practices in violation of O.R.C 1345.02 and 1345.03 and to Substantive Rules and case law.

163. Journey Lite was fully aware of its actions.

164. Journey Lite was fully aware that Plaintiff was induced by and relied upon Journey Lite's representations at the time Journey Lite was engaged by Plaintiff.

165. Had Plaintiff been aware that Journey Lite's representations as set forth above were untrue, Plaintiff would not have used the services of Defendants.

166. Journey Lite, through its agency and employees knowingly committed the unfair, deceptive and/or unconscionable acts and practices described above.

167. Journey Lite's actions were not the result of any bona fide errors.

168. As a result of Journey Lite's unfair, deceptive and unconscionable acts and practices, Plaintiff has suffered and continues to suffer damages, which include, but are not limited to the following:

    d.    Loss of money paid

    e.    Severe aggravation and inconveniences

    f.    Under O.R.C. 1345.01 Plaintiffs are entitled to:

        i. An order requiring Journey Lite restore to Plaintiff all money received from Plaintiff plus three times actual damages and/or actual/statutory damages for each violation;

        ii. All incidental and consequential damages incurred by Plaintiff;

        iii. All reasonable attorneys' fees, witness fees, court costs and other fees incurred;

        iv. Such other and further relief that this Court deems just and appropriate.

## COUNT V: PRODUCTS LIABILITY

169.    At all times Infuse/BMP-2 and Puregen are and were products as defined in R.C. § 2307.71(A)(12) and applicable law.

170.    Journey Lite (aka supplier) supplied either Medtronic's (aka manufacturer) Infuse/BMP-2 for surgery performed by Dr. Durrani on Plaintiff.

171.    Journey Lite, as a supplier, failed to maintain Infuse/BMP-2 properly.

172.    Journey Lite did not adequately supply all components required to use either Infuse/BMP-2 properly.

173.    Journey Lite knew or should have known the FDA requirements and Medtronic's requirements for using either Infuse/BMP-2.

174.    Journey Lite stored either Infuse/BMP-2 at its facility.

175.    Journey Lite ordered either Infuse/BMP-2 for surgery performed by Durrani.

176.    Journey Lite did not adequately warn Plaintiff that Infuse/BMP-2 would be used without all FDA and manufacturer required components.

177.    Journey Lite did not gain informed consent from Plaintiff for the use of Infuse/BMP-2, let alone warn of the supplying of the product without FDA and manufacturer requirements.

178.    Journey Lite failed to supply either Infuse/BMP-2 (aka product) in the manner in which it was represented.

179.    Journey Lite failed to provide any warning or instruction in regard to Infuse/BMP-2, and failed to make sure any other party gave such warning or instruction.

180.    Plaintiffs suffered physical, financial, and emotional harm due to Journey Lite's violation of the Ohio Products Liability act. Plaintiff's injuries were a foreseeable risk

181.    Plaintiff did not alter, modify or change the product, nor did Plaintiff know that the product was being implanted without all required components.

182.    Journey Lite knew or should have known that the product was extremely dangerous and should have exercised care to provide a warning that the product was being used and that the product was being used outside FDA and manufacturer requirements. The harm caused to Plaintiff by not providing an adequate warning was foreseeable.

183.    Journey Lite knew that the product did not conform to the representation of the intended use by the manufacturer yet permitted the product to be implanted into Plaintiff.

184.    Journey Lite, as a supplier, acted in an unconscionable manner in failing to supply the product without all FDA and manufacturer required components.

185.    Journey Lite, as a supplier, acted in an unconscionable manner in failing to warn Plaintiffs that the product was being supplied without all FDA and manufacturer required components.

186.    Journey Lite's actions demonstrate they took advantage of the Plaintiff's inability, due to ignorance of the product, to understand the product being implanted without FDA and manufacturer required components.

187.    Journey Lite substantially benefited financially by the use of the product as the product allowed for Defendant to charge more for the surgery.

188.    Plaintiff suffered economic loss as defined in R.C. § 2303.71(A)(2) and applicable law.

189.    Plaintiff suffered mental and physical harm due to Journey Lite's acts and omissions.

190.    Plaintiff suffered emotional distress due to acts and omissions of Journey Lite and are entitled to recovery as defined in R.C, § 2307.71(A)(7) and applicable law.

191.    Journey Lite violated the Ohio Products Liability Act R.C. § 2307.71-2307.80

192.    Journey Lite violated R.C. § 2307.71(A)(6).

193.    Journey Lite violated The Ohio Consumer Sales Practices Act R.C. § 1345.02-.03.

194.    Journey Lite provided inadequate warnings are defined in R.C, § 2307.76(A) and applicable law.

**COUNT VI: SPOLIATION OF EVIDENCE**

195.    Journey Lite through its agents and employees, willfully altered, destroyed, delayed, hid, modified and/or spoiled ("spoiled") Plaintiff's records, billing records, emails, paperwork and related evidence.

196.    Journey Lite through its agents and employees, spoiled evidence with knowledge that there was pending or probable litigation involving Plaintiff.

197.    Journey Lite's conduct was designed to disrupt Plaintiff's potential and/or actual case, and did in fact and proximately cause disruption, damages and harm to Plaintiff.

**<u>PRAYER FOR RELIEF</u>**

**WHEREFORE,** Plaintiffs request and seek justice in the form and procedure of a jury, verdict and judgment against Defendants on all claims for the following damages:

1.  Past medical bills;

2.  Future medical bills;

3.  Lost income and benefits;

4.  Lost future income and benefits;

5.  Loss of ability to earn income;

6.  Past pain and suffering;

7. Future pain and suffering;

8. Plaintiffs seek a finding that Plaintiff's injuries are catastrophic under Ohio Rev. Code §2315.18;

9. All damages permitted under Ohio Products Liability Act R.C. §2307.71-2307.80, and all other applicable law'

10. All incidental costs and expenses incurred as a result of Plaintiff's injuries;

11. The damages to Plaintiff's credit as a result of Plaintiff's injuries;

12. Punitive damages;

13. Costs;

14. Attorneys' fees;

15. Interest;

16. All property loss;

17. All other relief to which Plaintiffs are entitled including O.R.C. 1345.01

Based upon 1-18 itemization of damages, the damages sought exceed the minimum jurisdictional amount of this Court and Plaintiff seeks in excess of $25,000.

Respectfully Submitted,

Matthew Hammer (0092483)
Lindsay Boese (0091307)
*Attorneys for Plaintiff*
5247 Madison Pike
Independence, KY 41051
Phone: 513-729-1999
Fax: 513-381-4084
mhammer@ericdeters.com

## JURY DEMAND

Plaintiffs make a demand for a jury under all claims.

Matthew Hammer (0092483)
Lindsay Boese (0091307)

### Affidavit of Merit

I, Keith D. Wilkey, M.D., after being duly sworn and cautioned state as follows:

1.      I have reviewed all relevant medical records reasonably available about Laura Weisbecker concerning the allegations of medical negligence.

2.      I am familiar with the applicable standard of care.

3.      Based upon my review of this record, my education, my training, and experience, it is my belief, to a reasonable degree of medical certainty that the care provided by the Defendants Dr. Durrani and Journey Lite was negligent; and this negligence caused injury to Laura Weisbecker, *inter alia*, negligent and unnecessary surgery, negligent surgical techniques, failure to maintain accurate and complete surgical records, unnecessary pain management procedures based on fraudulent, inaccurate, and/or exaggeration of medical records, failure to maintain complete and accurate surgical consent forms, failure to obtain proper informed consent for use, failure to provide adequate/complete pre and post-operative patient surgical education and monitoring, failure to supervise Dr. Durrani, negligent pre- surgical diagnosis, improper documentation, health care fraud, battery, negligent treatment, practicing outside the scope of training, education, experience, and Board certifications, and medical negligence.

4.      I devote at least one-half of my professional time to the active clinical practice in my field of licensure, or its instruction in an accredited school.

5.      My curriculum vitae is attached.

**FURTHER AFFIANT SAYETH NAUGHT.**

_____
Keith D. Wiley, M.D.

STATE OF Missouri      )
COUNTY OF St. Louis      )

        SUBSCRIBED, SWORN TO, AND ACKNOWLEDGED, before me, a Notary Public, by Keith D. Wilkey, M.D, on the 23 day of Dec, 2013.

Angela Kay Poinsett
_____
Notary Public

My Commission Expires 07/18/2015

ANGELA POINSETT
Notary Public - Notary Seal
State Missouri
Commissione: Charles County
My Commission: July 18, 2015
Commiss. No. 133613



## COMMON PLEAS COURT
## HAMILTON COUNTY, OHIO

Laura Weisbecker

A 1 5 0 6 2 2 3

CASE NO. _____

**VS**

Abubakar Atiq Durrani, MD, et al.

**WRITTEN REQUEST FOR SERVICE**
**TYPE OF PAPERS TO BE SERVED ARE**

Complaint & AOM

(ᴮ) **PLEASE CHECK IF THIS IS A**
**DOMESTIC CASE**

**PLAINTIFF/DEFENDANT REQUESTS:**

**CERTIFIED MAIL SERVICE** _X_____

**PERSONAL SERVICE** _____

**PROCESS SERVICE** _____

**EXPRESS MAIL SERVICE** _____

**REGULAR MAIL SERVICE** _____

**RESIDENCE SERVICE** _____

**FOREIGN SHERIFF** _____

**ON** Journey Lite of Cincinnati, LLC; Serve: CT Corporation

1300 East Ninth Street,Cleveland, OH 44114

FILED
2015 NOV 16 P 12: 07
TRACY WINKLER
CLERK OF COURTS
HAMILTON COUNTY, OH

Matthew J. Hammer

859-363-1900

**ATTORNEY**

5247 Madison Pike Independence, KY 41051

**ADDRESS**

**PHONE NUMBER**

92483

**ATTORNEY NUMBER**

## COURT OF COMMON PLEAS
### HAMILTON COUNTY, OHIO

REQUEST AND INSTRUCTIONS FOR ORDINARY MAIL SERVICE

Laura Weisbecker
_____

**Plaintiff**

-vs-

Journey Lite of Cincinnati, LLC
_____

**Defendant**

INSTRUCTIONS TO THE CLERK

A 1 5 0 6 2 2 3

CASE NUMBER: _____

**IF SERVICE OF PROCESS BY CERTIFIED MAIL IS RETURNED BY THE POSTAL AUTHORITIES WITH AN ENDORSEMENT OF "REFUSED" OR "UNCLAIMED" AND IF THE CERTIFICATE OF MAILING CAN BE DEEMED COMPLETE NOT LESS THAN FIVE (5) DAYS BEFORE ANY SCHEDULED HEARING, THE UNDERSIGNED WAIVES NOTICE OF THE FAILURE OF SERVICE BY THE CLERK AND REQUESTS ORDINARY MAIL SERVICE IN ACCORDANCE WITH CIVIL RULE 4.6 (C) OR (D) AND CIVIL RULE 4.6 (E).**

## Matthew J. Hammer
ATTORNEY OF RECORD          (TYPE OR PRINT)

# \s\Matthew J. Hammer
ATTORNEY'S SIGNATURE



_____
DATE

TRACY WINKLER
CLERK OF COURTS
HAMILTON COUNTY, OH
2015 NOV 16 P 4:07
FILED